The argument next in the case of In Re Tzipori, Appeal 1119 from 2008. Good morning council, welcome to the court. Thank you very much. Please proceed. The board, shortly after the decision in KSR, picked up on a couple of points in KSR, that you don't leave common sense behind you, and you have to take into account creativity, but ignored the teaching that we've got to go back and avoid hindsight analysis that the current claims and discoveries of the proposed patent would be, and work back from it to say, oh yes, there are bits and pieces here in prior art that we can put together, and if we do, we will have the invention of your claims. I'm not sure, really, what the thrust of your argument is. Are you saying the references on which the examiner and the board depended were not combinable? I'm saying there was nothing that would suggest, in fact, that they would combine or that they would work. There's a problem with all of the references because they do not appreciate a fundamental scientific reality, and it's what the board didn't understand about the significance of the evidence about the piglet model. This is not a claim of the model. The piglet model is not incorporated into the claim. It doesn't. In assessing whether the invention as claimed is obvious, it seems to me the piglet model is utterly irrelevant, no matter how scientifically valuable an insight it might be. No, Your Honor, it gets the issue of the predictability, which has become, I think, very critical as this court's opinions in a whole chain of looking at what post-KSR you do in looking at predictable arts with finite solutions, and then whether you would predict if you take this and try this or combine it with that, you will get a successful solution. We're now dealing in this patent with technology in a highly unpredictable area where there are potentially hundreds of different kinds of monoclonal, polyclonal, or whatever clonal antibodies that one might attempt to try. The problem with all the models, even the Williams reference script notes this, the mouse models, the rabbit models, the experimental models, the in vitro models, is where you get predictability from those results to teach you the unique thing in this patch. And that was that one could have human-humanized or chimeric monoclonal antibodies specific to this sugar-like toxin 2, and more specific to particular subunits of it, and be effective. Alpha and the beta. To get to even the idea of subunits, the board picks and chooses bits and pieces from primarily what it does with the Williams and the Ferrara scheme. I'm still not sure I'm really getting the brunt of your attack here. It looked to me like all of this art was so precisely in the same field that it was quite readily combinable. So either that's right or it's wrong. If it's right, then you have to say, well, it doesn't suggest the various limitations in the claim. But it looked to me like if you add to CREBAN the teachings of the secondary references of which there were several, you do seem to get this exact invention. So I'm having trouble understanding where the board went wrong. The board, I think, went wrong in thinking that this was a situation where you would attempt to put those references together with a high likelihood and expectation of success. A high likelihood of hope. Well, I don't think that mere hope is enough for predictability. I thought that generally one of the things that characterizes chemical compounds is you don't know what's going to happen. You think, you hope it's going to do certain things, combine different molecules, but you never show up. It's not as predictable as if you have some electrical device and you know that if you produce electric current here, this is going to produce heat. It doesn't work that soon. And it's even less predictable if the chemical is being put into a human with the additional complications of human biology and reactions in the human system. That, I think, is what this panel, not this panel, but this court's recent opinion in the ICEI versus Dr. Reddy Laboratory case stressed, is that when you talk about combining references or when you talk about saying that you'd have a teaching if you looked in the art and saw that, okay, there's something about salts, there's something about antibodies to these salts that might be effectively treated. You pick some reference to a subunit here, a subunit there. You still don't have any teaching in that art that identifies clearly that it's salt two, not salt one, as William seems to suggest. Curban doesn't have a clue which salt it is. He just says, let's go after salts generally. You don't have direct teachings that it should be specific to the subunits or understand how the subunits work in any of these. You have all of these references, including Curban and Williams, which are years after the two references that teach, oh, you can make monoclonal human antibodies or humanize things. They didn't do that. They apparently didn't find it necessary to suggest that why don't we take our polyclonal avian-derived or bovine-derived antibodies and let's make them humanized. What these inventors did and what we've explained in the brief, their experiment showed from the application. Information that's never once discussed in the board opinion is that they got very contrarian results. That after coming up with some screening out of hundreds, we're not talking a little finite selection that you might look to, but after coming up with some screening panels, you found that this binding affinity and high levels of affinity, which can produce in a Petri dish some form of neutralization of a toxin or a subunit of a toxin, that didn't correlate with which monoclonal antibody would actually work. And here the piglet model becomes relevant because apparently there are only two species that really have the same progression with these virulent strains that produce HUS. You find a progression from an enteric infection primarily associated with the beta subunit of Shiga-2 into a systemic infection that's caused by the alpha subunit. And they found that the binding affinities, which you might thought would help tell you if it's a stronger binding partner and a Petri dish looks like it's better, it doesn't necessarily work. They got surprising results that their best treatment turned out to be the alpha subunit and that it was very specific, certain defined human monoclonal antibody. And there's a lot out there you can say, yeah, Kerman talks about we're going to have some antibodies and he talks about modifying DNA, but he never talks about humanized and he doesn't have any appreciation of the key significance of two subunits and the different things they do and why you have to target and identify monoclonal antibodies specific to those subunits. Kerman has no teaching whatsoever on that. He just has a broad claim saying we're going to use my antibodies, my polyclonal antibodies someday to treat humans without any real suggestion of how he does it. The board compounded, I think, its failure to appreciate the novelty of the invention by the way it chose to group claims and never independently examine three dose-specific claims. I don't understand that novelty was anything the board relied on. The board relied on obviousness. Well, obviousness, if I said novelty, it's a 103 issue all the way. And in that standpoint, obviously, obviousness is ultimately part of the issue. Is this something that is a new invention that we want to protect and it is based on not a single reference, but a combination under section 103. With respect to those three claims, 34, 35, and 36, they identified very specific ways to measure an effective dosage with numerical quantification based upon unique experimental results. Pribben stated a very broad range. There are decisions of this court that recognize that you can have patentably distinct subject matter when you find very specific effective units within a broad range. That was never considered by the board. Well, there's something about you people saying the board didn't consider this and the board obviously didn't understand that and the board gave no way to understand it. But we have said frequently, I've written a couple of these opinions, that the failure of a tribunal to discuss a point doesn't mean that the tribunal didn't consider it. And therefore, I don't know if you can fairly say that because the board didn't discuss all of these points that you're making, the board didn't consider them. The board may have considered them and concluded that they didn't want discussion. Your Honor, there's also other lines of authority, which I'm sure you and the other members of the panel are very familiar, that talks about the need to have a reasoned analysis so that we don't get lost in a fog of putative expertise on the part of some agency representative that's never disclosed in a reasoned opinion addressing the evidence before them. And the fact that the application is never once mentioned in this opinion. But it never once, for example, discussed the application and the experiments in the application. It sort of blew away any of the declarations related to the significance of the Piglet model, which was really trying to show the total unpredictability and unexpected results   that would arrive once you finally got the right sort of animal model, which the declarant says is the only way you would find what an effective dosage is. Just like the board says, hey, we have no evidence of unmet need. Well, the application recounted all the outbreaks and incidents of the severity of these diseases. If we're free to look at what a person of ordinary skill in the art would know, surely the headlines in 2007 about people dying and getting sick because spinach was contaminated with E. coli suggests there was an unmet need for an effective treatment for this kind of infection and outbreak. And that there wasn't anything yet that was doing that, though some of these prior art references have been around for a number of years. And so to the extent that there was evidence of that nature, and you have a board opinion saying, oh, we didn't see any evidence of unmet need, it was there in the application. Dr. Savori appeared for the board, and if you look at the appendix, page 35, which isn't in the joint appendix, you'll see he talked about the spinach episodes. A number of other references were presented. It talked about the incidence and severity of this disease for which there was no currently effective treatment. And these inventors came up with a very surprising discovery, possible only through using an animal model that is predictive of humans in contrast to results that these other people got when they used cell lines in a petri dish or tried mice, which don't develop HUS, or rabbits, which don't develop HUS, and said, well, we got some treatment of these animals, which is not at all predictive of whether what they disclosed would work in humans. You had to do the detailed experiments described in the application of Savori to make that discovery and determine what were the regions, what did you need to bind, what were the monoclonals to choose, and discover that, in fact, a lot of things that one might have thought would predict did not. Those experiments were critical. The board opinion, for whatever reason, chooses not to mention a single reference to the application of the details of the experiments. And without doing that, it is difficult to understand why are these people talking about a piglet model? It's because you have to have that to get to the prediction and the ability to come up with something with specific dosage that will deal with the human condition, which is so similar to the pig, of all lowly animals, which is the only other species that seems to develop these 80 lesions in the gut that let the disease migrate by letting the alpha subunit of sugar-2-like toxin into a systemic circulation. It's in the blood. They propose to treat it by injecting into the bloodstream these types of monoclonal antibodies specific to subunits. And for reasons we've spent probably more paper than the court really wishes any of us would use, we believe that you don't see a motivation to combine those references. You don't see inventors preceding these even thinking that the monoclonal human antibody was something they needed to be thinking about. And they don't disclose subunit-specific treatment to sugar-2. It's nowhere to be found. Let's hear from the government and give you a couple of minutes for rebuttal. Mr. McManus, welcome. Please proceed. May it please the court. The board here correctly found a very strong primal-facial case of obviousness for the lone independent claim, Claim 26, as this court has indicated in its questions to my opponent. Claim 26 is a dosage formulation. There's nothing in there about the piglet model. In fact, there's nothing in any other claim about using the piglet model or methods of determining potential therapies of treating sugar-like toxin-related diseases. Claim 26 is a dosage formulation. Crevon teaches a lion's share of the limitations in Claim 26. Crevon teaches you to use antibodies to the sugar-like toxin 2 to prevent or treat diseases like pus in humans. Now, what it doesn't treat or doesn't teach is the subunit specificity. But that is plainly taught by Pereira and Williams. Pereira and Williams teach you antibodies to the alpha and beta subunits of sugar-like toxin 2 and, more importantly, that those antibodies neutralize the toxin. The board correctly found at D6 that, given that disclosure, one would have been motivated to take those antibodies and use them in a method of prevention or treatment taught by Crevon. Their reliance on the piglet model is misplaced. You cannot rely on unclaimed limitations to show non-obviousness. Moreover, I don't think Zippori is saying, well, I'm the first one to use the piglet model. The evidence actually suggests the contrary. For example, Dr. Gunzer, who submitted a declaration in support of Dr. Zippori, says at A66, I've been using the piglet model since 1994 to test these kind of pathogens. There's also the Shioran article at A177 that cites two articles from 1991 and 1987, both talking about the piglet and the fact that the way the disease works in the piglet mimics the way it works in humans. So it's not like the piglet wasn't known out there or that the piglet could be used to investigate these kind of diseases. All Dr. Zippori has done, perhaps a scientific contribution, but has confirmed the teaching of the art, that's what this court said in Farmistead, that may be a scientific contribution, but that is not necessarily entitling you to a patent. Well, am I correct that their argument is that only in the piglet would you get this medical reaction? That this reaction took place either in humans or in piglets. And that was one of the things they discovered, that if you had it in the piglet, if you used turkeys or cows or sheep, it wouldn't work. And I understand that their argument is that the board ignored that and didn't even mention that you can have an unusual situation. And I don't know, is it a full answer to say, well, we're trying to make no reference to the piglet? I'm sure they're trying to make no reference to the piglet, but was the piglet significant in determining whether or not what they did would have been obvious, or whether they made a real contribution to the art? A couple of responses here. First and foremost, the board did address the merits of the piglet evidence at page 20. And the board said, your declarants, Leong, Gunzer, and Drs. Moon and Carr, all say only that the pig model is, offers, quote, uniquely relevant to studying these kind of infections. Offers great potential to investigating potential therapies. Problem is, the therapy they seek to get a patent on would have been within the scale of the art, for your mind, williams, and for your teaching. So the fact that the piglet model may have unique potential for investigating therapies is sort of a non-starter, where that therapy was already in the art. More importantly, none of those declarants said that you could only use the piglet model to investigate these kind of pathogens. While they may be preferred in the art, that's clearly blind by Crevon, who Crevon teaches the method, or the pharmaceutical composition that they seek to use to prevent or treat. Williams and Pereira don't use the piglet model, yet they teach monoclonal... In Crevon, Crevon used cows to generate his antibodies. He didn't necessarily use them to treat or prevent us in the cow. He used the cow to generate the antibodies, because he found, surprisingly, that when you put it into the cow, the cow did not have an adverse reaction to a toxin. So that was preferred, as opposed to the usual situation, where you had to inoculate the antibody generator first. So he used cows to generate his antibodies. Now, of course, he teaches polyclonal antibodies, but based on Queen and Engleman, for reference to psychobiotic examiner, and confirmed by the board, the use of monoclonal antibodies in these kind of treatments was known in the art. Which actually brings us back to another point that Cronin raised, which is the novelty, in their words, but the obviousness, non-obviousness of prevention, Prevon teaches that, and I don't think there's a dispute, the general use of antibodies to passively immunize humans was well known in the art. Prevon talks about that, and that's probably why he focuses on it. The knowledge that you could use antibodies to passively immunize humans was well known. Prevon tells us that at 8957, starting at about line 10, down through to 24. So, Prevon teaches, in combination with Williams and Pereira, the claim. The issue of reasonable expectation of success was firmly vetted by the board and soundly rejected. They said at 814 to 816 that the evidence was to the contrary. There was a reasonable expectation that you could use the antibodies of Pereira in the treatment of Prevon, largely because Pereira taught neutralization of the toxin. So, too, Williams. Williams teaches neutralization of the toxin. As this court explained multiple times in Apitex, for example, it doesn't have to be a certainty. All you have to show is that if there was a reasonable expectation, then it would work. And the fact that Williams and Pereira teach neutralization supported the conclusion that there was. The allegation that this is an unpredictable art is unto itself not dispositive, as this court explained in Apitex. Unpredictability only gets you so far. You have to show them that in light of the unpredictability, there was no reasonable expectation of success, which the board correctly rejected. Now, the issue of, as they term it, contrarian results, there is no evidence, and there was no argument to the board, of unexpected results here. All the declaratory evidence, for example, says is that the pig model is preferred. It doesn't say, and there's no evidence, that the antibodies that they tested in their piglet model were any different than the antibodies that Pereira and Williams, for example, teach, or that the antibodies taught by the site references wouldn't work. Just that I prefer the pig, and the pig mimics the human well, so it proves to be a very efficacious model. On the issue of dosage, the board correctly found that Crevan teaches dosages. That's from the layout at 960. He teaches a range of dosages. He teaches that once you go beyond understanding, you have to vary the dosage depending on the disease and the patient. In this book, the independent claim doesn't say anything about an explicit or specific dosage. It just talks in general formulations for effective dosage, whatever that is. Somebody reading that claim wouldn't be able to say, well, what the effective dosage is. Admittedly, claim 26, the independent claim, does use a generic term, effective dosage. Although the dependent student recites the list of explicit dosages. That's correct. In the main claim, the list of dosages just talks about an effective dosage. That's correct. But the passage at 960 in Crevan is starting at 980. I suppose in every pharmaceutical product, you want to provide an effective dosage as the purpose of it. I believe that's correct. And that's what Sifori tells us in his declaration. He says, to actually come up with the effective dosage in the human, I'm going to have to wait until clinical trials. Everything else is a best guess. And that's what Crevan tells us. He's starting at column 10, line 28 through 55. People in the art will understand how to come up with dosages. My range is 100 milligrams to 5 grams. But that you're going to need to vary it depending on the nature of your situation. And finally, I long felt the board soundly rejected that argument, largely because there's no evidence that others in this art had tried but failed to provide the method or the pharmaceutical composition that they seemed to claim. Contrast that with the Gambrill case where the court concluded that there was evidence that one felt need, largely because others had tried and failed to provide a solution to the problem there of this ultra-filtration in dialysis machines. Others had tried to play with the mechanics, had tried other various solutions that failed until the patentee came along and came up with a solution. There is no evidence here of failure of others. Given all of that, given the strong evidence of obviousness and the failure to rebut that with secondary evidence consideration, we respectfully request that this court affirm the board decision. If there are any other questions? I have a question about the grouping of claims 27 and 29. Sure. The board grouped claims 27 and 29 because that was how the court attributed them in his board. If you look at... What was the basis of rejecting claim 28 as a representative claim? The board treats the teachings of claims 28 and 20... Did you say 28 and 26? 28. At age 23, the board addresses the merits of independent claim 28. Claim 28 limits the antibody of claim 26 to recombinant DNA methodology. That's explicitly what Queen teaches as the board points out there. Does that address your Honor's question? No. The board seems to rely on the examiner's references to reject claim 28. That's correct. He seems to refer you to the examiner's answer. He does rely... He does incorporate the findings that the examiner made with respect to the teachings of the references. That is correct. And Queen, if you look at... Queen is found in the appendix F starting at A1054. Queen teaches the use or the generation of antibodies using recombinant DNA technology. Now, Queen doesn't teach using those antibodies to treat Shiga-like toxin-related diseases but he or she I can't tell. Kerry, wait. Queen does teach using those antibodies in methods of treatment. What the board said here and what the examiner said was that the technology of creating the human eyes or human antibodies was well known in the art of the time and that Queen teaches the motivation to use those antibodies in the treatment method taught by Prevost, specifically the fact that antibodies are less likely to be rejected by the human body while still maintaining the same affinity for the antigens. So there was a motivation to use this type of antibody in the treatment of Prevost. It looked to me like Queen taught away. It looked like Queen said don't do this because it won't work. Where is Your Honor referring to specifically? Perhaps you're referring to the section they're arguing about example 19 about subunit specificity. I'm not sure because Queen teaches for example if you look at Queen I don't believe there's any teaching in Queen about teaching away. Queen suggests that you can use recombinant DNA antibodies in methods of I'm looking at actually Queen was only cited for the recombinant DNA. There's nothing in there that I'm aware of that suggests you could use those humanized immunoglobulins. In fact, that's the reason why you want to create recombinant DNA as Queen says at 1054 in the abstract. When you combine the humanized immunoglobulins that have substantially non-immunogenic in humans, retaining the same affinity as the donor immunoglobulin to the antigen which of course the antigen is that's the mechanism by which the antibody does what you want it to do. It binds to the antigen and renders it ineffective. I'm not aware of anything in Queen that would suggest you could use Queen's antibodies in a method of treatment or prevention taught by the White House. Queen says something about the results will be uncertain because of the unpredictable binding affinities. It looked to me like it was teaching this isn't a useful direction to move in. Well, I'm not aware I'm not aware of any such teaching in Queen. Perhaps because again, Queen was only cited for sort of the, I don't want to use the term generic but for the teaching of recombinant people knew how to make recombinant DNA antibodies as required by one of the dependent claims. Queen wasn't cited. And then what else does the PTO align with besides Queen to reject 28? Well, all Claim 28 says, and remember this is the combination of Claim 28 limits the antibodies of Claim 26 to those generated by recombinant DNA technologies. The examiner on the board cited Queen for that specific teaching but of course 28 depends on 26 and 26 is taught by the references Freedon, Pereira, and Williams. That's the more global teaching of the treatment or prevention method. All Queen is supplementing is people in the art would have understood and would have been motivated to use recombinant DNA generated antibodies in that treatment. There's been no argument, I'm not aware of any citation in Queen that would suggest you couldn't use those recombinant DNA technology in there and in fact Freedon's his own specification teaches that you can, that the recombinant DNA methods at 553 of the specification starting at line 10 says in addition monoclonal antibodies which specifically bind to ST, SLT1, and SLT2 can be produced by recombinant DNA methodology citing to a 1993 manual from Cold Spring Harbor course. So I don't think there's any dispute that it was well within the skill and the art that you could use those kind of antibodies. Thank you. I think it is inescapable that even when you combine the five references that Ford has relied upon and the examiner relied upon there is no reference or no combination of them that very explicitly would put you in possession of certainty or reasonable likelihood or however one wants to phrase the test that in a human being you would be able to effectively treat HUS or prevent it by using a subunit specific to SLT2 form of treatment nor the specific quantifiable dosages that would be the starting point for any required dose ranging study in any clinical studies. If you look at some of the references again as the council described them, Herrera for example. Herrera was looking for a quick screening device because there was an appreciation that you want to find out when somebody seems to have an enteric infection is it one of these really bad kinds and if you can identify the presence of SLT2 which was associated with some of the more severe forms of infection that would be a good thing. So he found some monoclonal antibodies that in a cell culture in vitro test could recognize the presence of the SLT2 alpha region. Now that's a diagnostic to help you identify yes this person appears to have been opposed to virulent strains. That doesn't say... it operates the same way. Because you don't know that it does judge until you actually do the testing. It is not at all predictable or with a reasonable likelihood of success that something in this kind of technology that may help you diagnose or that's elevated or detectable in a human cell. It was essentially the same. The binding affinities are what made it work. Well but that's what didn't translate. Stronger binding affinities didn't necessarily give you the best suited monoclonal antibody for actual treatment or prevention. That's what's in those examples in the application that the board never discusses. That was some of the contrarian information. There are a lot of things in science where detectable presence of something may help you diagnose but it doesn't treat. Elevated PSA. There's no PSA drug therapy for prostate cancer. You're saying it's not combinable because it was for a different purpose? It doesn't teach you or give you any likelihood that you substitute the SALT2 antibodies of Perera and say focus on SALT2 alpha and you will get an effective treatment for humans. It doesn't point you in that direction. Williams points you away from it. If you look at both Williams specification passages we cited and you look at the examples he's all over the waterfront as to what might work in mice and in rabbits. Neither of which really are very relevant to predict human success because those are animals that don't develop HUS and you can't infer that hey I used something to SALT1 or I used a SALT2 beta in a rabbit or a mouse and I got some good results. Also got some bad results. What are you going to get? In fact I think that the fact that Dr. Gunster had been even working with the piglet model for years hadn't discovered this. The essence of your case is that even assuming all these references could be combined for everything they teach there would be no expectation that it would cure the disease in a human. That's correct Your Honor because there's nothing in the in vitro data or the animal models that anything was applied to that is predictive of success in humans until you do the experiments which they did on the pig. The only model that really mimics the human condition to derive quantifiable effective dosages found in the unexamined dependent planes and the overall key teaching about how this disease moves from enteric to systemic which subunits work and how you create a therapy based on it which you don't get from looking at those references and predict will succeed. I think the end of the decision of both courts is clarified and we appreciate the arguments. We'll take the appeal on your advice. Thank you. All rise. The Honorable Court is adjourned from day to day.